UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LEONARD JAMES BOVA,

        Plaintiff,

-vs-                                    Case No.  8:13-cv-212-T-JDW-DNF

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

Plaintiff, Leonard James Bova, seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying his claim for a Period of Disability, Disability Insurance Benefits, and Supplemental Security Income[1]. The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions.  For the reasons set out herein, it is respectfully recommended that the decision of the Commissioner be **REVERSED AND REMANDED** pursuant to § 205(g) of the Social Security Act, 42 U.S.C § 405(g).

## I.    Social Security Act Eligibility, Procedural History, and Standard of Review

The law defines disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

---

[1] Because the disability definitions for DIB and SSI are identical, cases under one statute are persuasive as to the other.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 (n.1 (11th Cir. 1986); *McCruter v. Bowen*, 791 F.2d 1544, 1545 n.2 (11th Cir. 1986).

result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d) (2); 20 C.F.R. §§ 404.1505-404.1511.

### A.    Procedural History

On November 18, 2009, Plaintiff filed an application for a Period of Disability and Disability Insurance Benefits. (Tr. 14).  Plaintiff also filed an application for Supplemental Security Income on November 20, 2009. (Tr. 14).  In both applications, Plaintiff alleged a disability onset date of February 2, 2008. (Tr. 14).  Plaintiff's claims were denied initially on March 31, 2010, and upon reconsideration on July 26, 2010. (Tr. 14).  An administrative hearing was held before Administrative Law Judge Richard E. Ouellette (the "ALJ") on July 22, 2011. (Tr. 14).  Plaintiff, Shirley Biddle, Tonya N. Baker, Jack Baker, and Vocational Expert ("VE") Joyce Ryan testified at the hearing. (Tr. 33).  At the hearing, Plaintiff amended his alleged disability onset date to November 25, 2009. (Tr. 38).  On December 12, 2011, the ALJ rendered his decision denying Plaintiff's claims. (Tr. 14-23).  Plaintiff's Request for Review was denied on November 20, 2012. (Tr. 4-8).

### B.    Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405 (g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate support to a conclusion.  Even if the evidence preponderated against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence." *Crawford v. Comm'r.*, 363 F.3d 1155, 1158 (11th Cir. 2004)

(citing *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). In conducting this review, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ, but must consider the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Martin v. Sullivan*, 894 F.2d 1329, 1330 (11th Cir. 2002); *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). However, the District Court will reverse the Commissioner's decision on plenary review if the decision applied incorrect law, or if the decision fails to provide sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't. of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  The Court reviews de novo the conclusions of law made by the Commissioner of Social Security in a disability benefits case. Social Security Act, § 205(g), 42 U.S.C.A. § 405(g).

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920.  At step one, the claimant must prove that he is not undertaking substantial gainful empoyment. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001), *see* 20 C.F.R. § 404.1520(a)(4)(i).  If a claimant is engaging in any substantial gainful activity, he will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(I).

At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments. *Doughty*, 245 F.3d at 1278, 20 C.F.R. § 1520(a)(4)(ii). If the claimant's impairment or combination of impairments does not significantly limit his physical or mental ability to do basic work activities, the ALJ will find that the impairment is not severe, and the claimant will be found not disabled. 20 C.F.R. § 1520(c).

In step three, the claimant must prove that his impairment meets or equals one of impairments listed in 20 C.F.R. Pt. 404, Sbpt. P. App. 1; *Doughty*, 245 F.3d at 1278; 20 C.F.R. §

1520(a)(4)(iii). If he meets this burden, he will be considered disabled without consideration of age, education and work experience. *Doughty*, 245 F.3d at 1278.

At step four, if the claimant cannot prove that his impairment meets or equals one of the impairments listed in Appendix 1, he must prove that his impairment prevents him from performing his past relevant work. *Id*. At this step, the ALJ will consider the claimant's RFC and compare it with the physical and mental demands of his past relevant work. 20 C.F.R. § 1520(a)(4)(iv), 20 C.F.R. § 1520(f) . If the claimant can still perform his past relevant work, then he will not be found disabled. *Id*.

At step five, the burden shifts to the Commissioner to prove that the claimant is capable of performing other work available in the national economy, considering the claimant's RFC, age, education, and past work experience. *Doughty*, 245 F.3d at 1278, 20 C.F.R. § 1520(a)(4)(v). If the claimant is capable of performing other work, he will be found not disabled. *Id*. In determining whether the Commissioner has met this burden, the ALJ must develop a full and fair record regarding the vocational opportunities available to the claimant. *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). There are two ways in which the ALJ may make this determination. The first is by applying the Medical Vocational Guidelines ("grids"), and the second is by the use of a vocational expert. *Phillips v. Barnhart*, 357 F.3d 1232, 1239 (11th Cir. 2004).  Only after the Commissioner meets this burden does the burden shift back to Claimant to show that he is not capable of performing the "other work" as set forth by the Commissioner. *Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

## II.     Review of Facts

### A.  The ALJ's Findings

At the first step, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through September 30, 2010, and had not engaged in substantial gainful activity since his alleged onset date of November 25, 2009.  (Tr. 16).

At the second step, the ALJ determined that Plaintiff suffered from the following severe impairments: (1) lumbar spine disc protrusion; (2) lumbar spine nerve root impingement; (3) cervical and lumbar radiculopathy; (4) history of left anterior cruciate ligament (ACL) tear, status post arthroscopy and debridement in January 2010 and reconstruction in April 2010; (5) bipolar disorder; (6) psychotic disorder not otherwise specified (NOS); and (7) polysubstance dependence. (Tr. 17).

At the third step, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1. (Tr. 17).  The ALJ explained that he gave particular consideration to Listing 1.00ff, the listings concerning the musculoskeletal system, but concluded that the findings in evidence do not approach the level of severity set forth in these or any other listing. (Tr. 17).  Further, the ALJ explained that he gave particular consideration to Listings 12.03, 12.04, and 12.09, the listings concerning schizophrenic, paranoid, and other psychotic disorders, affective disorders, and substance addiction disorders, respectively. (Tr. 17). Again, the ALJ determined that the findings in evidence do not approach the level of severity set forth in these listings or any other listings. (Tr. 17).

At the fourth step, the ALJ made the following residual functional capacity ("RFC") determination:

> The claimant has the residual functional capacity to perform a restricted range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant remains able to lift no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. The claimant remains able to stand and/or walk, off and on, for a total of approximately 6 hours of an 8-hour workday with sitting occurring intermittently during the remaining time. The claimant has frequent limitation for climbing, kneeling, and stopping but remains able to perform routine tasks in an environment with limited contact with the public and limited work stress.

(Tr. 18). Given this RFC, the ALJ found Plaintiff is unable to perform his past relevant work as a merchant marine/mechanical marine engineer, truck driver, and chief engineer. (Tr. 21).

At the fifth step, the ALJ considered Plaintiff's age, education, work experience and RFC and determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 22). Specifically, the ALJ found that Plaintiff could perform the occupation of small products assembler, mail sorter, and hospital products assembler. (Tr. 22). Based on these findings, the ALJ concluded that Plaintiff has not been under a disability, as defined by the Social Security Act, from November 25, 2009, through the date of his decision. (Tr. 23).

### C. Plaintiff's History and Medical Information

On November 25, 2009, an MRI was taken of Plaintiff's left knee by Paul Velt, MD of Community Diagnostic Center of Brandon. (Tr. 360). The MRI revealed that Plaintiff had suffered an interstitial rupture of the anterior cruciate ligament, a grade-3 sprain of the medial collateral ligament, low-grade sprain of the medial fibular ligament, a high-grade rupture of the patellar tendon, with only a few of the lateral fibers remaining. (Tr. 360). Dr. Velt further noted that Plaintiff had a high grade sprain/rupture of the medial patellar retinaculum, characteristic bone contusions of pivot-shift injury, large hemorrhagic effusion, and lateral meniscocapsular injury posteriorly. (Tr. 360).

On January 12, 2010, Plaintiff presented to the Suncoast Community Health Centers, Inc. for an orthopedic referral. (Tr. 338).   A Walk-in Encounter Form was completed providing that Plaintiff had knee pain and possibly knee dislocation. (Tr. 338).   Plaintiff was referred to Stuart A. Goldsmith, MD. (Tr. 338).

On January 12, 2010, Plaintiff presented to the Orthopaedic Medical Group and was examined by Dr. Goldsmith. (Tr. 312).   Dr. Goldsmith noted that Plaintiff had injured his knee while wrestling with a friend. (Tr. 312).   Dr. Goldsmith found that Plaintiff's MRI demonstrated signs consistent with an anterior cruciate ligament (ACL) tear and recommended Plaintiff to undergo knee arthoscopy. (Tr. 313).

On January 15, 2010, Dr. Goldsmith performed arthroscopic surgery on Plaintiffs left knee. (Tr. 320).   Dr. Goldsmith noted in his report of the surgery that there was a full disruption of the anterior cruciate ligament from its femoral attachment. (Tr. 321).   Dr. Goldsmith performed a debridement. (Tr. 321).   Dr. Goldsmith noted that Plaintiff tolerated the procedure well and was sent to the recovery room in satisfactory condition. (Tr. 321).

On January 26, 2010, Plaintiff presented to Dr. Goldsmith for a follow-up evaluation. (Tr. 311).   Dr. Goldsmith found that Plaintiff had done quite well following his outpatient arthroscopy, which revealed signs of a chronic tear of the ACL. (Tr. 311).   Dr. Goldsmith advised Plaintiff to wear a Playmaker brace and to undergo physical therapy. (Tr. 311).

On March 11, 2010, Plaintiff presented to Dr. Goldsmith for a follow-up evaluation. (Tr. 310).   Dr. Goldsmith found that Plaintiff had not greatly improved despite wearing a brace and exercising with a therapist. (Tr. 310).   Dr. Goldsmith referred Plaintiff to have ACL reconstructive surgery. (Tr. 310).

On April 2, 2010, Plaintiff presented to Scott E. Goldsmith, MD for a comprehensive evaluation in anticipation of ACL surgery. (Tr. 307).  Dr. Goldsmith noted that Plaintiff had undergone a debridement of his ACL tear the previous January, but that he continued to have severe instability and discomfort about the knee. (Tr. 307).  Dr. Goldsmith recorded that Plaintiff's knee buckles on him and causes him daily problems. (Tr. 307).  After an examination of Plaintiff, Dr. Goldsmith determined that Plaintiff had findings consistent with a complete ACL tear and recommended ACL reconstructive surgery. (Tr. 309).

On April 27, 2010, Plaintiff underwent a left ACL reconstruction with hamstring autograft performed by Scott E. Goldsmith, MD. (Tr. 317).  Dr. Goldsmith noted that Plaintiff had previously undergone an arthroscopic debridement of his ACL tear and subsequent bracing with physical therapy, but that he continued to have severe instability and discomfort about the left knee. (Tr. 317).  Dr. Goldsmith noted that Plaintiff tolerated the procedure well and was transferred to the recovery room in satisfactory condition. (Tr. 317).

On April 28, 2010, Plaintiff presented to Suncoast for a check-up visit and was seen by Evelyn C. Maningo, MD. (Tr. 334).  Dr. Maningo noted that Plaintiff had undergone reconstructive knee surgery on his left knee the day before. (Tr. 334).  An examination of Plaintiff revealed that he was alert and oriented times 3, was under no acute distress, was well nourished, and well hydrated. (Tr. 334). Dr. Maningo noted that Plaintiff ambulated with bilateral crutches. (Tr. 335).

On April 30, 2010, Plaintiff presented to Thomas V. Holland, MD, of Quality Care Medical Group, complaining of left knee pain post surgery, lower back pain, and neck pain. (Tr. 357).  Plaintiff described that the pain radiated down his legs and arms and caused numbness. (Tr. 357).  Plaintiff explained that he had reinjured his back in December of 2009 due to a slip

and fall accident. (Tr. 357). On May 20, 2010, June 18, 2010, July 15, 210, August 11, 2010,

September 8, 2010, October 6, 2010, November 3, 2010, December 1, 2010, March 11, 2011,

April 8, 2011, May 6, 2011, presented to Quality Care Medical Group for follow-up visits. (Tr.

339-356). Records from these follow-ups reveal that Plaintiff continued to experience pain in his

knee, back, and neck and continued to use Oxycodone, Xanax, and Flexeril, which Plaintiff

described as giving him 100% relief. (Tr. 342, 348).

On May 7, 2010, Plaintiff presented to Dr. Scott Goldsmith for a follow-up evaluation.

(Tr. 306). Dr. Goldsmith noted that Plaintiff denied experiencing severe pain or discomfort. (Tr.

306). Dr. Goldsmith remarked that Plaintiff was doing nicely two weeks out from his left ACL

reconstruction and recommended that Plaintiff begin physical therapy. (Tr. 306).

On May 20, 2010, an MRI was taken of Plaintiff's lumbar spine. (Tr. 279). Maria J.

Sanchez, MD noted that this MRI revealed desiccation and a broad-based left paracentral

protrusion at L4-L5 and an anatomic impingement of the left LF nerve root. (Tr. 279).

On November 18, 2010, an MRI was taken of Plaintiff's cervical spine. (Tr. 297). The

reviewing physician found that the MRI indicated cervical radiculopathy. (Tr. 297).

**D.  State Agency Evaluations**

On January 25, 2010, at the request of the Florida Department of Health, Division of

Disability Determinations, Plaintiff presented to Nekeshia Hammond, Psy.D., P.A., for a general

clinical evaluation with a mental status examination. (Tr. 257). Dr. Hammond's diagnostic

impression was that Plaintiff had bipolar I disorder, with his most recent episode being a manic

and moderate, psychotic disorder not otherwise specified, alcohol dependence (full remission

reported), cocaine dependence (full remission reported), vocational concerns, and a global

assessment functioning of 53. (Tr. 259). Dr. Hammond noted that Plaintiff had not taken

-9-

medications for bipolar disorder for one and a half years to two years and that it would be beneficial for Plaintiff to receive referrals for a psychiatrist so that he could get a medication consultation. (Tr. 259).  Dr. Hammond recommended that Plaintiff begin individual therapy to work on decreasing his symptoms of bipolar disorder, as well as working on appropriate ways to manage his anger. (Tr. 259).  Dr. Hammond noted that it would be helpful if Plaintiff received personality testing to rule out any personality disorders that may exist. (Tr. 259).  Dr. Hammond further recommended that Plaintiff receive additional vocational training and help in finding a job that is appropriate for his skills and mental health capacity when he is more emotionally stable. (Tr. 259).

On March 16, 2010, at the request of the SSA, a form was completed by someone[2] with the Orthopaedic Medical Group of Tampa Bay describing Plaintiff as having no sensory or motor neuropathy. (Tr. 262).  The person who completed the form found Plaintiff capable of squatting, walking on his toes, and walking his heels. (Tr. 262). The person described Plaintiff as having normal muscle strength. (Tr. 262).

On March 30, 2010, Janis Heffron, Ed.D., completed a Psychiatric Review Technique of Plaintiff. (Tr. 263-276).  Dr. Heffron found that Plaintiff had bipolar disorder, alcohol dependence, cocaine dependence, and substance induced psychotic disorder. (Tr. 271).  Dr. Heffron found that Plaintiff had mild restrictions on activities of daily living, mild difficulties in maintain social functioning, mild difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation. (Tr. 273).  Dr. Heffron, after reviewing Plaintiff's medical

---

[2] Although the signature of the person who completed the form is illegible, the notation on top of the form and a comparison with other signatures in the record (e.g., the signature on the prescription at Tr. 327)  suggests it is the signature of Dr. Stuart Goldsmith.

record, concluded that there is a question of exaggerated symptoms, both physical and mental. (Tr. 275).

On March 30, 2010, Ronald Strain[3] completed a Case Analysis of Plaintiff.  Mr. Strain noted that Plaintiff was a 43 year old man alleging disability due to lower back pain and numbness in hands. (Tr. 277).  Mr. Strain noted that an exam by the Orthopaedic Group of Tampa on March 16, 2010, documents an entirely normal exam. (Tr. 277).  Mr. Strain found that there was no indication of any impairment of a severe nature. (Tr. 277).

On June 29, 2010, Efren Baltazar, M.D., completed a Case Analysis of Plaintiff. (Tr. 281).  Dr. Baltazar noted that Plaintiff was a 43 year old male with complaints of back pain and hand numbness. (Tr. 281).  Dr. Baltazar noted that notes from an Orthopaedic Exam from March 16, 2010 indicated that Plaintiff's gait was within normal limits, and that the rest of Plaintiff's examination was within normal limits. (Tr. 281).  Dr. Baltazar found that Plaintiff did not have a severe impairment. (Tr. 281).

On July 26, 2010, Richard K. Lyon, Ph.D., completed a Psychiatric Review Technique of Plaintiff. (Tr. 282-295).  Dr. Lyon found that Plaintiff had "psychotic do vs substance induced psychosis" and "bipolar do vs substance induced do." (Tr. 284-285).  Dr. Lyon further found that Plaintiff had antisocial features and polysubstance abuse. (Tr. 289-290).  Dr. Lyons found that Plaintiff had mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation.  Reviewing Plaintiff's medical records, Dr. Lyons found that Plaintiff "does indeed suffer from some mental issues credibly noted as: Bipolar DO VS substance induced Mood DO; R/o Psychotic DO VS substance induced Psychosis; Antisocial

---

[3] The record does not indicate Mr. Strain's credentials.

features; Polysubstance abuse affecting mood, PD." (Tr. 294).  Further, Dr. Lyons found that

Plaintiff able to engage in a wide range of behaviors necessary for successfully daily living and

reasonable social and vocational functioning. (Tr. 294).  Dr. Lyons concluded that in his

judgment, "the preponderance of the evidence indicates the mental MDI does not meet or equal

any listings and is not severe for purposes of SGA." (Tr. 294).

### E.  Hearing Testimony

A hearing was held before the ALJ on July 22, 2011. (Tr. 32-81).  Plaintiff testified as

follows.  Plaintiff is single and lives with his fiancé. (Tr. 39).  He stopped working in November

2009 due to several psychological and physical problems. (Tr. 39).  He has bipolar disorder

which got drastically worse because he could no longer afford medication to treat it. (Tr. 39).

Plaintiff was messing around with a friend when they fell down together and his friend's leg got

caught beneath his own leg (Tr. 39).  This caused Plaintiff's left knee to become dislocated and

tore his meniscus and ACL in half. (Tr. 39).  Plaintiff testified that this knee injury interfered

with the type of work he had done in the past. (Tr. 40).  Before this injury Plaintiff had worked

as a truck driver for about a year. (Tr. 40).   Prior to working as a truck driver, Plaintiff worked

as a merchant marine on oil tankers from 1986. (Tr. 40).  Plaintiff explained that he worked in

the engine room and that his job required a lot of lifting, sharp climbing, bending twisting, and

kneeling. (Tr. 40).  Plaintiff testified that a person must use all of their inner core strength at

different periods of time and that it's a very strenuous job. (Tr. 40).

Plaintiff underwent surgery on his injured left ACL in January of 2010. (Tr. 41).  Plaintiff

testified that his doctor instructed him to do only minimal things and that he was on crutches

24/7. (Tr. 41).  Plaintiff was continually on his crutches until he had a second surgery. (Tr. 41).

Plaintiff underwent a second knee surgery due to continuing problems with the meniscus muscle

and the ACL. (Tr. 41).  Plaintiff testified that this procedure left him bedridden for over six

months. (Tr. 42).  While he was still on crutches due to his knee surgeries, Plaintiff had another

injury to his back and neck. (Tr. 42).  While he was staying at Brandon Hospital he suffered a

fall due to his crutches slipping on the tile floor. (Tr. 43).  Plaintiff testified that this accident

caused him pain in his lower back and neck. (Tr. 43).

 Plaintiff testified that the day before the hearing that he had undergone another knee

reconstructive surgery, this time on his right knee. (Tr. 43).  The surgery was necessary to treat

the complete tear of his right ACL. (Tr. 44).[4]  Plaintiff testified that he can no longer run, walk

long, or squat.  (Tr. 44).  Plaintiff has to take pain medicine constantly and the pain occasionally

brings a tear to his eye. (Tr. 44-45).  Plaintiff testified that his buttocks and inner legs were numb

and tingly and that he had been prescribed an operation for his lower back. (Tr. 43).  Plaintiff's

arms and two fingers on each hand are numb and tingly almost all the time which prevents him

from working heavy equipment. (Tr. 46).

 Plaintiff testified that he can walk approximately the distance of a football field before

needing to sit down. (Tr. 46).  After he sits down, if he does not have pain medicine, Plaintiff has

to change positions every five minutes, and has to prop himself up with pillows. (Tr. 46).

Plaintiff testified that he can only stand for approximately 10-15 minutes before needing to sit

down. (Tr. 47).  He cannot be comfortable, standing or sitting, for more than 10 to 15 minutes.

(Tr. 47).

 Pain medication relieves his pain drastically, but not completely. (Tr. 47).  Plaintiff

testified that he can bend at the waist, but not to the extent that he used to. (Tr. 47).  Plaintiff

---

[4] The Court has thoroughly reviewed Plaintiff's medical record and notes that there is no medical evidence regarding
this procedure.  In any event, Plaintiff no longer met the insured status requirements of the Social Security Act at the
time of this third knee surgery.

testified that he could not bend at the waist or kneel regularly, which is the third of an eight hour day. (Tr. 47).  The numbness in his hands prevents him from working around sensitive equipment and that he cannot work his past jobs because he cannot lift like he used to. (Tr. 48).  He can lift a gallon of milk but sometimes the numbness in his hands causes him to drop the milk or a glass of juice will slide out of his hands. (Tr. 49).  Plaintiff testified that he has difficulty climbing stairs and that he has to put both feet on a step while climbing. (Tr. 49).  Plaintiff testified that he gets two to three migraines a month. (Tr. 49).  Plaintiff described the migraines as feeling like there is so much pressure that his head will explode. (Tr. 50).

Plaintiff testified that he was diagnosed with bipolar disorder and manic depression after returning from Desert Storm. (Tr. 50).  Plaintiff explained that years ago his bipolar disorder benefitted him because it helped him be productive at work. (Tr. 51).  Plaintiff explained that he has a depression cycles where he goes through five days a month and then crashes for a couple of days. (Tr. 51).  When he is depressed it takes everything for him to get up and just take a bath. (Tr. 51).    Plaintiff explained that he may up for five days straight and then sleep for two to three solid days. (Tr. 51).  He has horrible nightmares, panic attacks, and heat flashes. (Tr. 51-52).  Plaintiff feels claustrophobic when he is in a room with a bunch of people. (Tr. 52).  Plaintiff testified that he has hallucinations where he believed that a helicopter was following him, that people were taking photographs of him, and that had lasers pointed at him. (Tr. 52).  These hallucinations still happens and that he hears things outside that are not really there. (Tr. 52).

Plaintiff testified that he was referred to pain management but that the pills are expensive. (Tr. 52).  He spends the majority of his days sitting in a recliner. (Tr. 53).  Prior to his surgery, he was using a cane and had a prescription for a walker. (Tr. 53).  His friend or fiancé do all the chores around the house. (Tr. 53-54).  He has no social life and can no longer play sports as he

-14-

used to. (Tr. 54).  He was arrested in November 2010 and December 6, 2010 for running from the police. (Tr. 55).

Next, Plaintiff's mother Shirley Biddle testified at the hearing.  Ms. Biddle testified as follows.  She sees her son every other day. (Tr. 58).  Plaintiff hurt his back on a ship many years ago but never sought treatment. (Tr. 58).  Plaintiff's back has gotten worse and worse over the years to the point that he cannot lift things up or do anything. (Tr. 58).  Plaintiff had hurt his knee very badly, it has never healed correctly and he cannot put any weight on it. (Tr. 59).  Ms. Biddle testified that Plaintiff is always in pain. (Tr. 60).  Plaintiff has had psychological problems since he was 20 years old. (Tr. 60).  Plaintiff will stay up for five days and then sleep for three days and he hears things outside the house which are not really there. (Tr. 60).  Ms. Biddle testified that Plaintiff's paranoia is serious and that he has a lot of panic attacks. (Tr. 61).  Plaintiff was arrested in November 2010 for taking her car and wrecking it.  (Tr. 62).  Ms. Biddle testified that Plaintiff gets terrible headaches. (Tr. 63).

Next, Plaintiff's fiancée, Tonya N. Baker, testified on behalf of Plaintiff. (Tr. 64).  Ms. Baker testified as follows.  Plaintiff has a hard time getting in and out of bed, walking, standing, and basically doing anything. (Tr. 65-66).  These problems stem from his bad knees and due to his lower back and neck. (Tr. 66).  Ms. Baker testified that Plaintiff has pain in his neck and back every day. (Tr. 67).  Plaintiff has headaches about three to four times a month which prevent him from doing anything. (Tr. 67).  Plaintiff hears things that are not there. (Tr. 67).  Ms. Baker testified that Plaintiff was arrested in November of 2010 due to them arguing and a neighbor calling the police complaining. (Tr. 68).  Ms. Baker testified that Plaintiff was arrested in December of 2010 for taking his mother's car and wrecking it. (Tr. 69).  Plaintiff has mood swings where one moment he is nice and the next moment he is hollering and screaming. (Tr.

70).  Plaintiff has unusual sleeping habits and will stay up for five days and then sleep for three

days. (Tr. 70-71).  Ms. Baker testified that Plaintiff has difficulty walking 100 feet. (Tr. 71).

Plaintiff could not perform a job that required sitting because his back stiffens up, his knees

cramp, and his ankles and knees swell. (Tr. 72).  Plaintiff can sit for approximately 20 to 30

minutes before he needs to stand up and walk around. (Tr. 72).  Plaintiff has difficulty with the

use of his arms, his hands, and fingers. (Tr. 72).  Ms. Baker testified that Plaintiff cries all the

time due to the pain. (Tr. 73).

Next, Jack Baker testified on behalf of Plaintiff. (Tr. 75).  Mr. Baker testified that the

Plaintiff resides with him. (Tr. 75).  Mr. Baker testified that Plaintiff is irritable due to his pain

and that he has an extremely irregular sleep pattern. (Tr. 77).

Next, the VE, Joyce Ryan testified at the hearing.  The ALJ asked the VE the following

hypothetical question:

> Assume an individual has the same age, education, nd work experience as the
> claimant, and has the following residual functional capacity: capable of light work
> with a frequent limitation for climbing, kneeling, and stooping; but capable of
> performing routine tasks with limited contact with the public and limited work
> stress.  Are there any jobs?

(Tr. 79).  The VE testified that such an individual could work as an assembler of small products,

DOT 739.687-030. (Tr. 79).  The VE testified that such a job is light with an SVP: 2. (Tr. 79).

The VE testified that there are 50,000 such jobs in the national economy, over 1,100 such jobs in

Florida, and over 100 such jobs in the Tampa area. (Tr. 79).  The VE also identified the job of

mailroom sorter, DOT 209.687-026, which is also light with an SVP: 2. (Tr. 79).  The VE

testified that there are over 31,000 jobs nationally, over 2,500 jobs in Florida, and over 150 jobs

in the Tampa area. (Tr. 79-80).  The VE also identified the job of assembler of plastic hospital

products, DOT 712.687-010, light, SVP: 2. (Tr. 80).  The VE stated that there are 12,000 such

jobs nationally, over 1,600 jobs in the state, and 200 such jobs in the Tampa area. (Tr. 80).

Plaintiff's attorney questioned the VE and asked if there would be any work available for

the Plaintiff if he needed to lie down or rest for 15 minutes every hour and a half per day.  The

VE answered that there would not be any job that the Plaintiff could perform. (Tr. 80).  The VE

testified that a person would not be able to work if the person was absent from work at least three

days per month due to depressive periods and sleeping through those days. (Tr. 80).

## II.    Specific Issues and Conclusions of Law

Plaintiff raises five issues on appeal: (1) the ALJ erred in failing to indicate the frequency

with which Plaintiff would need to intermittently sit and stand/walk, (2) the ALJ erred in relying

upon the responses of the VE to an incomplete hypothetical question, (3) the ALJ erred in failing

to make a proper credibility finding as to the Plaintiff's testimony, and erred in improperly

discrediting Plaintiff's complaints of pain and subjective symptoms, (4) the ALJ erred in failing

to give proper weight to the testimony of Plaintiff's mother, Plaintiff's fiancée, and Plaintiff's

roommate, (5) the ALJ failed to accord substantial weight to the findings of Plaintiff's treating

physicians.

### A.  Whether the ALJ erred in failing to indicate the frequency with which Plaintiff would need to intermittently sit and stand/walk.

Plaintiff argues that although the ALJ indicated that Plaintiff requires the ability to

alternate between sitting and standing, the ALJ erred by failing to specify how frequently

Plaintiff requires such a change in position. (Doc. 16 p. 4).  Plaintiff argues that a RFC must be

specific as to the frequency of the need to alternate sitting and standing in order to evaluate the

extent of the erosion of an occupational base. (Doc. 16 p. 4).  Plaintiff contends that he can only

sit for approximately 15 minutes before needing to change position, and thus, this limitation seriously erodes the occupational base for a full range of unskilled light work. (Doc. 16 p. 4).

Defendant responds that the ALJ found that Plaintiff had the RFC to perform a restricted range of light work as defined in the regulations, and that he specifically noted that Plaintiff could stand and/or walk a total of 6 hours in an 8-hour day, and that Plaintiff could sit intermittently during the remaining time, which would be 2 hours. (Doc. 21 p. 4).  Defendant argues that this RFC determination allowed Plaintiff to perform light level work as defined by Social Security Ruling 83-10p. (Doc. 21 p. 4).

In this case, the ALJ did not err by failing to specify the frequency in which Plaintiff needs to intermittently sit and stand/walk.  The ALJ found that Plaintiff remains able to stand and/or walk, off and on, for a total of approximately 6 hours of an 8-hour workday with sitting occurring intermittently during the remaining time. (Tr. 18).  This finding is not limitation on Plaintiff's RFC but a recitation of one requirement of light work. *See* SSR 83-10p (providing that "the full range of light work requires standing or walking, off and on, for a total approximately 6 hours of an 8-hour workday.").  Essentially, Plaintiff is arguing that an ALJ must specify the frequency a claimant can sit or stand whenever there is a finding that a claimant can work at the light level.  There is no such requirement.  Furthermore, Plaintiff's reliance on SSR 96-9p is misplaced because, as the plain language of that ruling makes clear, it only applies in cases involving individuals with an RFC assessment for less than a full range of sedentary work. *See* SSR 96-9p; *see also Boyce v. Astrue,* 2012 WL 1245658, at *3 (S.D. Ga. March 15, 2012).  For these reasons the Court finds that the ALJ did not err in failing to specify the frequency that Plaintiff needs to sit or stand.

**B.  Whether the ALJ erred in relying upon the responses of the VE to an incomplete hypothetical question.**

Plaintiff argues that the ALJ erred by failing to ask a hypothetical question comprehensively describing Plaintiff's impairments and improperly relying upon the VE's response. (Doc. 16 p. 4).  Specifically, Plaintiff argues that the ALJ failed to include in his hypothetical question a limitation he included in his RFC finding, i.e. that "the claimant remains able to stand and/or walk, off and on, for a total of approximately 6 hours of an 8-hour workday with sitting occurring intermittently during the remaining time." (Doc. 16 p. 5).  Plaintiff argues that the ALJ's hypothetical question was insufficient and that remand is necessary for a determination of vocational ability based upon a hypothetical that accurately reflects Plaintiff's RFC. (Doc. 16 p. 5).

Defendant responds that the ALJ did not pose an incomplete question to the VE. (Doc. 21 p. 5).  Defendant notes that the ALJ specifically asked whether a person with all of Plaintiff's characteristics, including the capability to perform light level work, would be able to perform jobs in the national economy. (Doc. 21 p. 5).  Defendant argues that the VE was familiar with the regulatory definition for light work, and therefore, he was aware that the ALJ's statement that Plaintiff could perform light work meant that he could stand or walk, off and on, for a total of approximately 6 hours of an 8-hour workday. (Doc. 21 p. 5).

In this case, before posing his hypothetical question to the VE, the ALJ inquired whether the VE was "familiar with the regulatory definitions of unskilled, semiskilled, sedentary, light, medium, heavy, and very heavy work[.]" (Tr. 78).  The VE responded in the affirmative. (Tr. 78).  Thereafter, the ALJ posed the following hypothetical question:

> Assume an individual has the same age, education, and work experience as the claimant, and has the following residual functional capacity: capable of light work with a frequent limitation for climbing, kneeling, and stooping; but capable of

> performing routine tasks with limited contact with the public and limited work stress.  Are there any jobs?

(Tr. 79).  As noted above, SSR 83-10 provides that "the full range of light work requires standing or walking, off and on, for a total approximately 6 hours of an 8-hour workday."  By providing that the hypothetical individual could perform light work, which under the regulations requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday, the ALJ's hypothetical question comprised all of Plaintiff's impairments.  The VE's testimony that she was familiar with the regulatory definition of light work is evidence that she considered the ability to stand or walk in providing her testimony.  Accordingly, the Court finds that the ALJ did not err on this ground.

### C. Whether the ALJ erred in failing to make a proper credibility finding as to Plaintiff's testimony, to fully develop the record and erred in improperly discrediting Plaintiff's complaints of pain and subjective symptoms.

Plaintiff argues that the ALJ erred by failing to make a proper credibility finding as to Plaintiff's testimony. (Doc. 16 p. 6).  Plaintiff argues that the ALJ erred by discrediting Plaintiff's testimony due to a few "inconsistencies". (Doc. 16 p. 6).  For example, Plaintiff argues that the ALJ misconstrued Plaintiff's testimony that he "ran from the cops." (Doc. 16 p. 7).  Additionally, Plaintiff argues that the ALJ erroneously relied on the language on the progress notes from Quality Care Medical Group that document Plaintiff's wishes to *continue* being able to do activities of daily living, working, and maintaining function. (Doc. 16 p. 7).  Further, Plaintiff argues that although the record is silent as to mention of occasions when Plaintiff had dropped things, there is medical evidence showing Plaintiff complained of neck pain that radiates down both arms with numbness in hands and arms. (Doc. 16 p. 5).

Defendant responds that the ALJ properly considered Plaintiff's subjective complaints and articulated adequate reasons for discounting his allegations of disabling limitations. (Doc. 21

p. 6).  Defendant argues that despite numerous statements by Plaintiff that alleged disabling

limitations, the record provides substantial evidence to support the ALJ's finding that Plaintiff's

subjective complaints were not credible. (Doc. 21 p. 6)

In the Eleventh Circuit, when a claimant alleges disability based on pain or other

subjective symptoms, "[t]he pain standard requires: (1) evidence of an underlying medical

condition and either (2) objective medical evidence that confirms the severity of the alleged pain

arising from that condition or (3) that the objectively determined medical condition is of such a

severity that it can be reasonably expected to give rise to the alleged pain." *Dyer v. Barnhart*,

395 F.3d 1206, 1210 (11th Cir. 2005) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.

1991)).  If a claimant's subjective testimony of pain is supported by medical evidence that

satisfies the pain standard, the claimant's testimony is itself sufficient to support a finding of

disability. *Holt* at 1223.  However, an ALJ may choose not to credit such testimony. *Foote v.

Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).  If the ALJ decides not to credit the testimony of

the claimant about his subjective pain, the ALJ must "articulate explicit and adequate reasons for

doing so." *Id.* at 1561-62.  If the ALJ fails to do so, then, as a matter of law, that testimony is to

be accepted as true. *Id.* at 1562.

In his opinion, the ALJ found that Plaintiff's allegations concerning the limiting effect of

his symptoms were not fully credible due to inconsistencies between them and the evidence of

record, and inconsistences between some of Plaintiff's own comments. (Tr. 21).  The ALJ noted

that although Plaintiff contends that he has experienced pain and instability of a disabling nature

since November 2009, progress notes from Quality Care Medical Group indicate that Plaintiff

reported being a general contractor when asked about his work status. (Tr. 21).  The ALJ further

noted that Plaintiff's "reports of being arrested in November and December of 2010, with one

arrest for 'running from the cops,' which is inconsistent with allegations of difficulty even standing." (Tr. 21).  The ALJ further explained the Plaintiff's allegation of numbness, tingling, and loss of feeling in his hands that causes him to drop objects are also inconsistent with the March 2010 Orthopedic Medical Group questionnaire that documents Plaintiff as having normal grip strength. (Tr. 21).  Also, the ALJ stressed that notes from Quality Care Medical Group document Plaintiff's "wish to *continue* being able to do activities of daily living, working, and maintaining function." (Tr. 21) (emphasis in original).

Here, the Court finds that the ALJ erred in his credibility analysis because he failed to provide adequate reasons for his decision to discredit Plaintiff's testimony.  For example, although the ALJ places great emphasis on Plaintiff's testimony that he was arrested for 'running from the cops,' there is reason to believe that Plaintiff did not mean that he was physically running.  At the hearing, Plaintiff's mother and fiancé both testified that Plaintiff's arrest in December 2010 involved Plaintiff wrongfully taking his mother's car and wrecking it. (Tr. 62, 69).  It is unclear from the record whether Plaintiff "ran from the cops" while still driving his mother's car or whether he did so on foot.  In any event, Plaintiff's usage of the idiom "run from the cops" does not constitute substantial evidence that undermines his testimony concerning his subjective complaints.

Also, the Court finds that the ALJ's reliance on the progress notes from Quality Care Medical Group do not constitute adequate reasons to discredit Plaintiff's testimony.  Although the progress notes from November 2009 indicate that Plaintiff reported being a general contractor when asked about his work status, it is ambiguous whether Plaintiff was currently working as a general contractor or merely reporting his past work experience.  Furthermore, the ALJ's emphasis that Plaintiff indicated during an April 2011 visit to Quality Care Medical Group

that he "wished to _continue_ being able to do activities of daily living, working, and maintaining function" is not evidence discrediting Plaintiff's testimony.  As Plaintiff correctly points out, the progress notes areas that the ALJ refers to is a "goals" area and the "continue" is a pre-printed generic statement on every form that is used by patients.  The fact that Plaintiff indicated it was his goal to continue to do activities of daily living, working, and maintaining functioning is not evidence undermining his subjective complaints of pain.

For these reasons, the ALJ's failure to properly evaluate Plaintiff's testimony mandates a reversal of the Commissioner's finding that Plaintiff is not disabled.  On remand, the ALJ must reevaluate Plaintiff's allegations concerning the limiting effect of his symptoms and adequately explain his credibility finding.[5]

### D. Whether the ALJ erred in failing to give proper weight to the testimony of Plaintiff's mother, Plaintiff's fiancée, and Plaintiff's roommate.

Plaintiff argues that the ALJ erred by failing to give proper weight to the testimony of the lay witnesses who testified on behalf of Plaintiff at the administrative hearing. (Doc. 16 p. 5). Plaintiff argues that the ALJ failed to give an adequate explanation as to the reason the ALJ discredited the testimony of these three lay witnesses.  Defendant responds that the ALJ specifically considered the testimony from Plaintiff's mother, fiancée, and roommate, but determined that the testimony of disabling limitations was not supported by the evidence of record. (Doc. 21 p. 9).

An ALJ must state specifically the weight accorded each item of evidence and the reasons for his decision. _Cowart v. Schweiker_, 662 F.2d 731, 735 (11th Cir. 1981) ("What is required is that the ALJ state specifically the weight accorded to each item of evidence and why

---

[5] The Court notes that the ALJ's reevaluation may affect his determination of Plaintiff's RFC and the ALJ's reliance on the VE's testimony.  In particular, if the ALJ credits the Plaintiff's testimony that he can only stand for approximately 10-15 minutes before needing to sit down, then the VE's response to the ALJ's hypothetical question will not constitute substantial evidence.

he reached that decision.").  Nevertheless, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" and a reviewing court can conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005).  Further, the Eleventh Circuit "does not require an explicit finding as to credibility" if the implication is obvious to a reviewing court. *Tieniber v. Heckler,* 720 F.2d 1251, 1255 (11th Cir. 1983).

In his opinion, the ALJ specifically noted that that Plaintiff's "mother, fiancée, and roommate also testified at the hearing that [Plaintiff] experiences pain, sleep disturbance, hallucinations, paranoia, and instability." (Tr. 21).  Although he did not make specific findings as to the credibility of these witnesses, the ALJ's finding that the Plaintiff's subjective complaints of pain were not credible clearly implies that the ALJ did not find the witnesses' testimony credible as well.  As the Court is recommending that this case be remanded due to the ALJ's failure to properly consider Plaintiff's testimony, the Court further recommends that, upon remand, the ALJ be directed to reconsider the testimony of Plaintiff's mother, fiancé, and roommate, and sufficiently explain the weight he accords their testimony and the reasons for his decision.

### E.  Whether the ALJ failed to accord substantial weight to the findings of Plaintiff's treating physicians.

Plaintiff argues that the ALJ erred by failing to accord substantial weight to the findings of Plaintiff's treating physicians. (Doc. 16 p. 8).  Plaintiff argues that it is unclear what weight, if any, the ALJ accorded Plaintiff's treating physicians' opinions.  Thus, Plaintiff argues, as the ALJ failed to indicate the weight he accorded Plaintiff's treating physicians' opinions, the ALJ has performed reversible error.  Defendant argues that the Plaintiff's argument should be waived because Plaintiff does not identify the doctor's to whom the ALJ failed to specify the weight he

accorded their decisions. (Doc. 21 p. 10).  Defendant further argues that the ALJ's opinion

demonstrates that he considered the entirety of Plaintiff's medical evidence and that his

determination of Plaintiff's RFC was based on substantial evidence of record.

"The Secretary must specify what weight is given to a treating physician's opinion and

any reason for giving it no weight, and failure to do so is reversible error." *MacGregor v. Bowen,*

786 F.2d 1050, 1053 (11th Cir. 1986) (citation omitted).  The Eleventh Circuit has held that

whenever a physician offers a statement reflecting judgments about the nature and severity of a

claimant's impairments, including symptoms, diagnosis, and prognosis, what the claimant can

still do despite his or her impairments, and the claimant's physician and mental restrictions, the

statement is an opinion requiring the ALJ to state with particularity the weight given to it and the

reasons therefor. *Winschel v. Comm'r of Social Security,* 631 F3d 1176, 1178-79 (11th Cir.

2011).  Without such a statement, "it is impossible for a reviewing court to determine whether

the ultimate decision on the merits of the claim is rational and supported by substantial

evidence." *Id.* (citing *Cowart v. Shweiker,* 662 F.2d 731, 735 (11th Cir. 1981)).  The opinions of

treating physicians are entitled to substantial or considerable weight unless good cause is shown

to the contrary. *Phillips v. Barnhart,* 357 F.3d at 1240.

In this case, although Plaintiff argues that the ALJ failed to accord substantial weight to

the opinions of Plaintiff's treating physicians, Plaintiff fails to specify the treating physicians'

opinions the ALJ failed to weigh.  The record demonstrates that the ALJ considered the medical

treatment notes of Plaintiff's treating physicians, Dr. Stuart Goldsmith, Dr. Scott Goldsmith, and

Dr. Maningo.  However, a review of the record reveals that these treating physicians never

offered an opinion on Plaintiff's impairments and what type of work he is still capable of doing

despite his impairments.  For this reason, the Court finds that the ALJ did not err on the ground

that he failed to state the weight he accorded the opinions of Plaintiff's treating physicians.

### IV.     Conclusion

For the reasons explained above,

**IT IS RESPECTFULLY RECOMMENDED THAT**

1)  The decision of the Commissioner be **REVERSED AND REMANDED** pursuant to

42 U.S.C. § 405(g).

2)  The District Court direct the ALJ upon remand to evaluate the subjective testimony of

Plaintiff, his mother, fiancé, and roommate, and articulate an adequate credibility

finding that is supported by substantial evidence as to this testimony.

In Chambers, Fort Myers, Florida, this 12th day of February, 2014.

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations in this
report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within fourteen (14) days of the
date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of
issues covered in the report, and shall bar an aggrieved party from attacking the factual findings
on appeal.

The Court Requests that the Clerk of Court Mail or Deliver Copies of this Order to All Parties
and All Counsel of Record